UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Allen Beaulieu, individually and d/b/a Allen Beaulieu Photography,<br><br>Plaintiff,<br><br>v.<br><br>Clint Stockwell, an individual; Studio 1124, LLC, a Minnesota limited liability company; Thomas Martin Crouse, an individual; Charles Willard "Chuck" Sanvik, an individual, and Does 3 through 7,<br><br>Defendants. | Civil No. 16-3586 (DWF/HB)<br><br>**MEMORANDUM OPINION AND ORDER** |

---

Russell M. Spence, Jr., Esq., Parker Daniels Kibort LLC, counsel for Plaintiff.

Michael L. Puklich, Esq., Neaton & Puklich, P.L.L.P., counsel for Defendants Clint Stockwell and Studio 1124, LLC.

Edward F. Fox, Esq., Lauren Shoeberl, Esq., and Lewis A. Remele, Jr., Esq., Bassford Remele, counsel for Defendant Charles Willard Sanvik.

Eva Wood, Esq., Outfront MN, counsel for Defendant Thomas Martin Crouse.

---

**INTRODUCTION**

This matter is before the Court on Defendant Charles Willard "Chuck" Sanvik's ("Sanvik") Motion for Summary Judgment.[1] (Doc. No. 164.) Plaintiff Allen Beaulieu

---

[1] Beaulieu brings similar claims against Defendants Clink Stockwell, Thomas Martin Crouse, Studio 1124, LLC, and Does 3 through 7 ("Co-Defendants"). Defendant Stockwell has also filed a Motion for Summary Judgment. (Doc. No. 147.) While a similar analysis applies, the Court addresses Defendant Stockwell's motion separately.

individually and d/b/a Allen Beaulieu Photography ("Beaulieu"), alleges that Sanvik is in possession of stolen photographs and that he has conspired to use the stolen photographs to Beaulieu's detriment. Sanvik was not a party to the original lawsuit. (Doc. No. 1 ("Compl.").) He was added as a defendant approximately one year later pursuant to Beaulieu's Amended Complaint. (Doc. No. 47 ("Am. Compl.").) Beaulieu brings three claims against Sanvik: (1) conversion (Count IV); (2) tortious interference with prospective advantage (Count VII); and (3) injunctive relief (Count III).[2] For the reasons set forth below, the Court grants Sanvik's motion and dismisses all counts against him.

## BACKGROUND

Beaulieu photographed the artist Prince for several years. (Doc. No. 47 ("Am. Compl.") ¶ 18.) He obtained a Certificate of Copyright Registration in a collection of photos entitled, "Before Purple Rain, Prince 1979-1983" ("Photos") on November 8, 1984. (*Id.* ¶ 21, Ex. A ("Copyright").) The Photos included a combination of 2 ¼" and 35mm photographs, contact sheets, and negatives. (Doc. No. 199 (" Opp.") at 7.) In or about 2015, Beaulieu sought to publish the Photos in a book.[3] (Am. Compl. ¶ 27; Doc. No. 171 ("Fox Decl. Ex. B.") at 70-78.) He collaborated with Defendants Clint

---

[2]  The Court previously dismissed without prejudice Beaulieu's claim for tortious interference with prospective advantage. (Doc. No. 69.) Because Beaulieu did not further amend his complaint, the Court now dismisses this claim with prejudice (Count VII) against Sanvik.

[3]  This is not the first time Beaulieu desired to publish a book with the Photos. A prior attempt fell through. When initially collaborating with Stockwell and Crouse, he sent them a template of the book he initially attempted to publish. (Doc. No. 170 ("Beaulieu Dep.") at 15-18.)

2

Stockwell ("Stockwell") and Thomas Martin Crouse ("Crouse") to create the book. (Am. Compl. ¶¶ 28-29.) In or about May 2015, Beaulieu provided Stockwell with a hard drive and CD containing digital copies of his Photos. (Beaulieu Dep. at 162, 206; Fox Decl. Ex. B at 70-78.) In April 2016, Beaulieu, Stockwell, and Crouse completed a production ready, eighth draft of the book using the digital copies of Beaulieu's Photos. (Fox Decl. Ex. A., Beaulieu Dep. at 29, 91-92.) No original Photos were used to create the book. (*Id.* at 17-18, 25-26.) Beaulieu sent a copy of the draft to his literary agent, who shared it with a potential publisher. (*Id.* at 29.)

After Prince died unexpectedly on April 21, 2016, there was an increased demand for pictures of him.[4] (Am. Compl. ¶ 35.) Shortly after, a low resolution MP4 slideshow ("Slideshow") and press release with approximately 141 digital copies of Beaulieu's Photos was created to promote Beaulieu's work. (Opp. at 15-16; Doc. No. 172 ("Stockwell Dep.") at 253-254; Doc. No. 207 ("Fox Supp. Decl.") ¶ 6(B), Ex. Q. ("Slideshow E-mail").) The Slideshow E-mail was circulated to at least 12 people, including Defendant Charles Sanvik ("Sanvik").[5] (Opp. at 1, 15.) The press release included with each Slideshow indicated that Beaulieu holds the full copyright to all of the

---

[4] The publisher to whom Beaulieu sent a copy of the book also requested a larger book with additional Photos. (Beaulieu Dep. at 26-27, 41.)

[5] Stockwell sent the Slideshow E-mail to Sanvik on April 27, 2016 as a potential investor in the book. (Doc. No. 166 ("Memo.") at 8.) The two had collaborated on business opportunities in the past. (*Id.*)

(Footnote Continued on Next Page)

photographs.⁶  Beaulieu alleges that the Slideshow was created and circulated without his knowledge or consent and that it was used to promote more than just the book. (Opp. at 1-2.)

On May 6, 2016, though, Crouse sent an e-mail to Beaulieu with the Slideshow and press release attached. (Slideshow E-mail.) A separate e-mail from Crouse to Beaulieu shows that Beaulieu was aware of the plan to market his work as early as July 30, 2015. (Fox. Supp. Decl. ¶ 6(A), Exs. O-P.) The marketing plan includes reference to a website to serve as a "virtual gallery," social media accounts, video clips of the book and photos for sharing on social media, and a list of media outlets to contact. (*Id.*, Ex. O.) During a deposition, Beaulieu acknowledged receipt of these e-mails. (*Id.* ¶ 7, Ex. S. at 375-379.) The record also reflects that Beaulieu received an e-mail from a social media company regarding a page featuring his work in July 2016, that he forwarded the e-mail to Crouse, and that Crouse responded by encouraging him to post promotional material on the page. (Doc. No. 204 ("Facebook") at 1.)

In May 2016, Stockwell and Crouse agreed to digitally scan all of Beaulieu's original, physical photographs to assist with the increased demand for his work.⁷ (Am.

---

⁶ The record reflects that a modification of the Slideshow E-mail was sent to one person on July 10, 2016. (Doc. No. 192 at 21; *see also* Doc. No. 196 ("Beeman Decl.") ¶ 34, Ex. 34 ("Modification").) The Modification states that the Photos are Beaulieu's original imagery, but states, "B4 THE RAIN© holds full rights to all images from the catalog." The record reflects that Stockwell formed a limited liability company with the name "B4 the Rain LLC," on September 21, 2016. (*Id.* ¶ 37, Ex. 37 ("LLC").)

⁷ Sometime after Beaulieu gave Stockwell and Crouse what he thought was his entire collection of Photos, he found an envelope in his home containing 316 2 ¼" Photos. (Beaulieu Dep. at 88.)

4

Compl. ¶ 42; Opp. at 18-19.) Beaulieu did not create a list, inventory, or archive of his Photos before giving them to Stockwell and Crouse. (Beaulieu Dep. at 42-43, 57.) Beaulieu alleges in both his original and amended complaints that he gave Stockwell and Crouse approximately 3,000 Photos to scan and return within 2 weeks. (Doc. No. 1 ("Compl.") ¶ 40; Am. Compl. ¶ 42.) At the motion to dismiss hearing, the number rose to 4,015. (Doc. No. 140 ("Rule 12 Hearing") at 31.) Beaulieu subsequently testified that he provided Stockwell and Crouse with approximately 6,000 Photos.[8] (Beaulieu Dep. at 45.) An initial inventory created after this lawsuit started indicates that Beaulieu gave Stockwell and Crouse 5,332 of his 2 ¼" Photos. (*See* Fox Decl. Ex. B at 3 ("Inventory 1"). A subsequent inventory indicates that he gave them 5,384 of his 2 ¼" Photos. (Doc. No. 193 ("Beaulieu Decl.") ¶ 59, Ex. 19 ("Inventory 2").)[9] There is no inventory of the 35mm Photos. (Beaulieu Dep. at 153-154.)

When Stockwell and Crouse failed to return the Photos despite multiple requests, collaboration on the book fell apart. (Am. Compl. ¶¶ 51-53.) Beaulieu argues that while in possession of his Photos, Stockwell conspired with Co-Defendants to use them in ways he did not know about or authorize. (*Id.* at 54-56.) When his Photos remained unreturned after several months, Beaulieu ultimately filed suit on October 24, 2016. (Compl.) Despite the lawsuit, Sanvik attempted to engage Beaulieu by phone, text, and

---

[8] Beaulieu testified that this number was based on the number of photos he believed that he filed with the U.S. Copyright Office in 1984. (Beaulieu Dep. at 45.)

[9] The inventories are based on Beaulieu's memory and a methodology he used to take pictures of Prince. (Beaulieu Dep. at 260; Beaulieu Decl. ¶¶ 5-6.)

5

e-mail to express his continued interest in the book project. (Memo. at 9.) He also communicated with Stockwell and Crouse regarding the lawsuit. (Opp. at 25; *see also* Beeman Decl. ¶ 39, Ex. 39 ("Sanvik E-mail").) Sanvik maintains that he abandoned the project when his attempts to revive it failed. (Memo at 9.) He also maintains that but for the unsolicited Slideshow E-mail, he never saw nor possessed any of Beaulieu's Photos, and that he has done nothing to interfere with Beaulieu's interest in the Photos. (*Id.* at 8.)

On the same day Beaulieu filed his lawsuit, his attorney personally retrieved the Photos from Stockwell's home. (Doc. No. 157 ("Receipt").) His attorney generated a receipt listing the items he took (e.g., 5 plastic boxes, 2 black cardboard boxes, 85 plastic sleeves), but did not quantify the actual number or type of Photos he removed. (*Id.*) Beaulieu's attorney delivered the Photos to Beaulieu's home the night he retrieved them. (Beaulieu Dep. at 55-59.) The Photos remained at Beaulieu's home for three months until his attorney collected them to store at his law office. (*Id.* at 65, 67-69.)

Beaulieu initially alleged that Stockwell failed to return 5,170 Photos. (Inventory 1 at 3.) That number increased to 5,222 missing Photos in Inventory 2. (Inventory 2; Opp. at 1.) The record does not reflect why the number changed. The number 5,222 is based on Beaulieu's memory and a specific methodology he used to photograph Prince:

> I had a very specific methodology for shooting those formal shots [of Prince], and followed that methodology regularly whenever I shot Prince for specific projects. I would always bring what was called a 'brick' of 2 ¼" rolls of film which would be cellophane packaged together as 20 rolls. Each roll of 2 ¼" film contained 12 shots, so I always knew I would end up with photographs in amounts that would be multiples of 12. 40 rolls, or two bricks, would be used for a very important shoot, like the album

6

artwork sessions. That meant 480 shots would be taken, and
480 photographs would result. 20 rolls would be for moderately important
shoots, such as posters. Those would use a single brick of 20 rolls, of 12
shots each, or 240 photographs. The smallest amount of 2 ¼" rolls I would
bring to a shoot is 6, which equated to 72 photographs. Prince would *never*
let me shoot less than the entire supply of film that I brought to those
shoots, so those totals were uniform calculations, each time I would do a
formal studio shooting session with Prince. When I photographed less
formal, or live shots, those were almost always done with my 35-millimeter
camera, which created negatives of slides of 35mm in size. I did not have a
standard shooting practice for these live or informal shoots, so the formula
above does not apply to my 35mm photographs.

(Beaulieu Decl. ¶ 5-6 (emphasis in original); *see also* Beaulieu Dep. at 56, 61, 119-23, 257-60.)

To identify the missing photos, Beaulieu subtracts the Photos currently in his possession from the total number of Photos he remembers taking. (*See* Inventories 1 and 2.) The record reflects that both the Minnesota Historical Society and Warner Brothers are in possession of a number of Beaulieu's Photos. (Doc. No. 155 ("Puklich Aff. Ex. A"); Doc. No. 156 ("Puklich Aff. Ex. B"); *see also* Doc. No. 180 ("Fox Decl. Ex. L")) This is not indicated in Inventory 1 or Inventory 2.[10]

---

[10] The record reflects that the Minnesota Historical Society is in possession of 35mm and 2 ¼" Photos. (Fox. Decl. Ex. L.) It is unclear what type of Photos Warner Brothers is in possession of.

7

Stockwell maintains that he is no longer in possession of any Photos, nor that has he attempted to unlawfully commercialize any of them. (Doc. No. 149 at 11.) A forensic analysis of his electronic devices supports his denial of unlawful use.[11] (*Id.* at 11, 25.) Stockwell also maintains that he never provided Sanvik with anything other than the Slideshow E-mail. (Stockwell Dep. at 245-56.)

## DISCUSSION

**I.     Legal Standard**

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009). However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must demonstrate

---

[11]     The initial parties to the lawsuit stipulated to a Forensic Protocol designed to identify evidence of unlawful access, transmission, and/or copying of Beaulieu's Photos. (Doc. No. 149 at 11, 25-26; *see also* Doc. No. 15 ¶ 13.)

the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

**II.     Lack of Support for Claims**

Beaulieu's claims are premised on his allegation that Stockwell and/or co-defendants unlawfully possess over 5,000 of his photos. The Court finds that the record does not contain sufficient facts to support this allegation. "A [claim] founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Yarborough v. DeVilbiss Air Power, Inc.*, 321 F.3d 728, 730 (8th Cir. 2003) (quoting *Nat'l Bank of Commerce v. Dow Chem. Co.*, 165 F.3d 602, 610 (8th Cir. 1999)). "While we are required to make all reasonable inferences in favor of the nonmoving party in considering summary judgment, we do so without resort to speculation." *Twymon v. Wells Fargo & Co.,* 462 F.3d 925, 934 (8th Cir. 2006) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 923-24 (8th Cir. 2004)). Simply put, Beaulieu "must substantiate [his] allegations with more than mere 'speculation, conjecture, or fantasy,' in order to survive summary judgment." *Marquez v. Bridgestone/Firestone, Inc.*, 353 F.3d 1037, 1038 (8th Cir. 2004) (citing *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir.2003)).

Here, Beaulieu relies on his memory to quantify the total number of Photos he took of Prince. While he cites a specific methodology he employed over thirty years ago to photograph Prince, the methodology does not account for any deviation or margin of

9

error. Indeed, the record reflects several different totals ranging from 3,000 to 6,000 Photos.

To arrive at the number of missing Photos, Beaulieu merely subtracts the number of Photos he thinks he gave Stockwell and Crouse from the number of Photos he thinks he took.[12] Beaulieu acknowledges that there are only 567 2 ¼" copyrighted photos, but he declares that there must be 5,200 missing because that's what he remembers taking. (Beaulieu Dep. at 152.) Until his most recent declaration, Beaulieu claimed to have filed all of the photographs he took with the United States Copyright Office. (*Compare* Beaulieu Dep. at 260, *with* Beaulieu Decl. ¶ 7.)[13] The record reflects 4,015 copyrighted photos.[14] (Rule 12 Hearing at 31.) This does not square with Inventory 1 or Inventory 2.

The Court is perplexed by Beaulieu's lack of accounting for the 35mm Photos. In a deposition on April 30, 2018, Beaulieu testified that he was still in the process of inventorying his 35mm Photos, eighteen months after commencing this lawsuit.

---

[12] The Court recognizes that Inventory 2 accounts for the Photos Beaulieu found in his home after mistakenly believing he provided his entire collection to Stockwell and Crouse. The Court also recognizes that without an inventory of the specific Photos Beaulieu provided to Stockwell and Crouse, created at the time he provided the Photos, there is no way to determine whether he truly provided Stockwell and Crouse with *all* of his Photos.

[13] The Court disregards Beaulieu's declaration that he did not file all of his photos with the United States Copyright Office. A party may not create a genuine issue of material fact in opposition to a motion for summary judgment by submitting an affidavit that contradicts sworn deposition testimony. *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 136-66 (8th Cir. 1983).

[14] The Court also acknowledges Michael Puklich's Affidavit that Beaulieu copyrighted 4,037 photos, some not including Prince. (Doc. No. 153 ¶ 2.) The Court relies on Beaulieu's assertion of 4,015. (Opp. at 6.)

(Beaulieu Dep. at 152-153.) The Court understands that Beaulieu's conversion claim is based only on the missing 2 ¼" Photos, and that his inventories are designed to reflect that. Nonetheless, the Copyright includes both 35mm and 2 ¼" photographs, ostensibly incorporating the 35mm photographs in his other claims. There appears to be no inventory of or accounting for the 35mm Photos at all.

In sum, there is no inventory of the 35mm Photos, and two inventories of the 2 ¼" Photos based almost exclusively on Beaulieu's memory after he commenced this lawsuit. Similarly, there is no inventory of the Photos (35mm or 2 ¼") Beaulieu initially provided to Stockwell and Crouse, nor an inventory of what was initially retrieved from Stockwell's home. Without a verifiable inventory of the specific Photos Beaulieu possessed, an inventory of the specific Photos Beaulieu provided to Stockwell and Crouse, nor an inventory of the specific Photos returned, it is mere speculation that Stockwell remains in possession of any missing Photos.

In opposing summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of his pleading but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court finds Beaulieu's speculative allegation that Stockwell and/or Co-Defendants remain in possession of his Photos insufficient to survive summary judgment. This contributes to the failure of each of Beaulieu's claims against Sanvik.

### III. Conversion (Count IV) and Injunctive Relief (Count III)

Beaulieu claims that Sanvik conspired with Co-Defendants to convert his Photos and exploit his work. To prevail on a conversion theory, a plaintiff must show that the

11

defendant committed "an act of willful interference with personal property, 'done without lawful justification by which any person entitled thereto is deprived of use and possession.'" *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997) (citing *Larson v. Archer-Daniels-Midland Co.*, 32 N.W.2d 649, 650 (Minn. 1948)). To constitute conversion, interference must be either permanent or must last "for an indefinite length of time." *Bloom v. Hennepin Cty.*, 783 F. Supp. 418, 441 (D. Minn. 1992); *Hildegaarde v. Wright*, 70 N.W.2d 257, 269 (Minn. 1955).

Here, there is no evidence to support a conversion claim against Sanvik. Beaulieu testified that he has no evidence that Sanvik has or had possession of his physical Photos. (Beaulieu Dep. at 96-99, 103-04, 154-55.) The record reflects nothing else to suggest that Sanvik ever possessed more than the Slideshow E-mail which contained only low-resolution copies of Beaulieu's Photos. Minnesota law does not recognize a claim for conversion of intellectual property. *Bloom*, 783 F. Supp. at 418.

Beaulieu argues that he is not required to prove that Sanvik possesses the Photos to prevail on a conversion theory. (Opp. at 34.) Citing *Kloos v. Gatz*, 105 N.W. 369, 640 (Minn. 1906), Beaulieu argues that he must show just an assertion of dominion over the Photos, and an interference with his right to possess them. (Memo. at 35.) Because the Court finds no factual support in Beaulieu's allegation that Co-Defendants remain in possession of any physical Photos, this argument fails.

Beaulieu cites a number of "suspicious circumstances" to suggest that Sanvik conspired to convert his Photos prior to their return. (Opp.at 38.) He relies heavily on one sentence in the Sanvik E-mail to argue that Sanvik encouraged Stockwell not to

return Beaulieu's Photos. Read in its entirety, the Court finds that the Sanvik E-mail does not support this argument. The record is devoid of any other evidence to suggest that Sanvik and Co-Defendants conspired to use Beaulieu's Photos without his knowledge or consent. While Beaulieu argues that Sanvik's admissions regarding other projects to promote Beaulieu's Photos is evidence of conspiracy, the record reflects that Beaulieu knew about and participated in a marketing plan with similar projects proposed. (Fox. Supp. Decl. ¶ 6(A), Exs. O-P.)

For these reasons, the Court finds that Beaulieu's conversion claim against Sanvik (Count IV) fails as a matter of law. Because Beaulieu's underlying tort claims fail, his request for injunctive relief (Count II) fails as well.

## CONCLUSION

The Court finds that the record does not contain sufficient facts to support the allegation that Sanvik or Co-Defendants remain in possession of his Photos, or that Sanvik used or conspired to use them unlawfully when they were out of Beaulieu's possession. As a result, there is no genuine issue of material fact and Sanvik is entitled to summary judgment on all claims. The Court also dismisses with prejudice Beaulieu's claim for tortious interference with prospective advantage because Beaulieu did not further amend his Amended Complaint.

**ORDER**

Based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS HEREBY ORDERED** that:

1. Defendant Charles Willard "Chuck" Sanvik's Motion to for Summary Judgment (Doc. No. [164]) is **GRANTED**.

2. Plaintiff's Amended Complaint (Doc. No. [47]) as alleged against Defendant Charles Willard "Chuck" Sanvik's is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated:  December 7, 2018     s/Donovan W. Frank
                             DONOVAN W. FRANK
                             United States District Judge